UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          :
                                  :
         - v. -                   :
                                  :          11 Cr. 65 (JSR)
GEORGE PAUL SALEMO,               :
    a/k/a "Gerald Meyers,"        :
                                  :
         Defendant.               :
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Adam Fee
Assistant United States Attorney
        -Of Counsel-

The Government respectfully submits this memorandum in connection with the sentencing of defendant George Salemo, which is scheduled for October 19, 2011. For the reasons set forth below, the Court should sentence the defendant to a term of imprisonment with the applicable advisory Sentencing Guidelines range.

## BACKGROUND

Between March and May 2009, the defendant used a forged grant agreement purportedly entered into by the defendant's company and the U.S. Department of Agriculture ("USDA") to attempt to solicit up to $1 million in loans from his intended victims in exchange for the defendant's "assignment" of the $2.25 million grant award from the USDA. Subsequently, between August and November 2010, the defendant attempted to use fraudulent checks and bank records to convince a real estate company in California, Milbank Real Estate ("Milbank"), to transfer ownership of six apartment buildings in New York City, valued at a total price of $22 million.

On November 18, 2010, the defendant was charged in complaints 10 Mag. 2561 and 10 Mag. 2562 with wire fraud offenses relating, respectively, to the USDA grant scheme and the real estate scheme described above. On January 19, 2011, the defendant was charged in Indictment 11 Crim. 65 (JSR), with two substantive counts of wire fraud relating to these schemes. In June and July 2011, the defendant proceeded to trial.

The evidence presented during the trial established that the defendant engaged in a scheme (1) to defraud others using fraudulent USDA grants; and (2) to defraud Milbank into proceeding with a $22 million real estate transaction. (*See* United States Probation Office's Pre-Sentence Report, dated October 12, 2011 ("PSR"), ¶¶ 8-17). First, in connection with the USDA

grant scheme, the defendant used a fake USDA grant agreement between the defendant's company and the USDA – which bore none of the indicia of an authentic grant agreement – to try to convince three separate investors to loan the defendant between $750,000 and $1 million in exchange for the purported $2.25 million grant award described in the grant agreement.  (Tr. 56-68, 71-92, 484-506; PSR ¶¶ 8-10).  The defendant represented to his victims that the grant award was ready to be transferred as long as the victims made up-front cash payments to the defendant.  (Tr. 56-68, 71-92, 484-506).

Second, in connection with the real estate fraud, the defendant entered into a contract to purchase $22 million worth of buildings owned by Milbank in an *all cash* transaction. (Tr. 402-3).  The defendant submitted, or caused to be submitted, fraudulent documents – including a forged bank statement and three copies of fraudulent $5 million checks – to Milbank's employees to persuade Milbank to proceed with transferring ownership of the properties to the defendant.  (Tr. 406-27; PSR ¶¶ 12-15).  Additionally, the defendant, for a substantial portion of this scheme, used a false identity when dealing with Milbank, and falsely represented to Milbank employees, and others, that he was a wealthy businessman.  (Tr. 361, 382-83, 391-405, 509-512).

On July 7, 2011, after six days of trial, the jury convicted Salemo on Counts One and Two of the Indictment.

On October 12, 2011, the United States Probation Office (the "Probation Office") issued its revised Presentence Investigation Report (the "PSR") for the defendant, including its analysis of the application of the Guidelines to the defendant's offenses.  The PSR states that the loss amount for the scheme charged in Count One of the Indictment is $500,000, and $22 million

for the scheme charged in Count Two, resulting in a 22-level increase above the base offense level of six.[1]  (PSR ¶¶ 10, 16-17).

The PSR states that, based on the defendant's 10 previous criminal convictions and his commission of the instant offenses while on supervised release, he has 12 criminal history points, which places him in criminal history category V.  (PSR ¶¶ 33-67).  Based on these calculations, the Probation Office concluded that the total offense level and corresponding advisory Guidelines range is level 28 and 130-162 months' imprisonment.  (PSR ¶¶ –).  The Probation Office recommends a sentence of 130 months' imprisonment on both counts to run concurrently.  (PSR at 30 (Sentencing Recommendation)).

## ARGUMENT

For the reasons set forth below, the Government respectfully submits that application of the sentencing factors to the defendant's conduct calls for a sentence within the Guidelines range.  In particular, the need for the sentence imposed to reflect the seriousness of the defendant's offense, to afford adequate deterrence from criminal conduct and to protect the public from further crimes of the defendant weighs strongly in favor of a Guidelines range sentence.

### I.  The Defendant's Intended Loss for the Scheme Charged in Count Two Is $22 Million, As Reflected in the PSR

In his sentencing submission, the defendant claims that the intended loss for the real estate fraud charged in Count Two should be zero or a "minimal loss."  (Defendant's Letter

---

[1] The evidence at trial established that the intended loss for the USDA grant scheme charged in Count one was $1 million, as that was the highest amount of funds sought by the defendant from two of his potential victims.  (*See* Tr. 61-62, 487).  Thus, the total intended loss for Count One should be $1 million, which change has no effect on the offense level calculated in the PSR.

Dated Oct. 12, 2011 ("Def. Ltr.") at 2-5). Specifically, the defendant asserts that the evidence at trial failed to establish that he intended to cause $22 million in loss but, instead, showed that the defendant "intended to pay the purchase price of the properties, and that his transmission of the checks was done as an attempt to buy time in the transaction." (Def. Ltr. at 3). Put simply, the defendant's claim misrepresents the evidence offered at trial.

The evidence overwhelmingly demonstrated that the defendant intended to obtain properties valued at $22 million from Milbank without paying for them. The defendant fraudulently altered a bank statement he stole from another person, wrote two fraudulent checks on a bank account that had been closed for several years, and wrote a third check on an account that held only a few thousand dollars provided by the father of one of the defendant's accomplices, Christopher Barnes. (Tr. 248-61). The evidence also established that, once he was released from prison in the fall of 2010, the defendant relied on funds paid out to him by Julie Corrado from the money supplied by Barnes's father. (Tr. 191, 248-61). At the same time, the defendant was lying to Milbank and to Julie Corrado about his own wealth, telling them over and over again that he had the money needed to complete the $22 million "all cash" transaction. (Tr. 183). All of this evidence pointed to the defendant's singular purpose: to convince Milbank to transfer ownership of the properties when, in fact, the defendant did not have sufficient funds to complete the purchase. The defendant's intent was plain – to get the properties without paying for them.

The principal evidence pointed to by the defendant in support of his is that some of the evidence referenced a mortgage that the defendant intended to take out on the properties he was trying to steal from Milbank. (*See* Def. Ltr. at 3). However, the mortgage scheme

concocted by the defendant involved obtaining a mortgage loan only *after* the defendant had tricked Milbank into transferring ownership of the properties to the defendant without the promised "all cash" payment to Milbank; the defendant's plan was that one of his sham corporations would use the mortgage proceeds to purchase the properties from another of his sham corporations. As the defendant informs the Court in his sentencing submission, he wanted to take out a mortgage loan on behalf of "the *Fordham Group Properties* to purchase the buildings from *American Reclaimed Properties* . . . ."[2] (Def. Ltr. at 3 (quoting Tr. 197) (emphasis added)). The Fordham Group Properties and American Reclaimed Properties were corporations under the defendant's control used by him to further his scheme; and, of course, neither company is Milbank Real Estate, the actual owner of the $22 million of real estate and the intended victim of the defendant's fraud.

        Additionally, the defendant erroneously relies on the fact that his scheme was unsuccessful as proof that he did not intend to obtain the properties without paying. (*See* Def. Ltr. 3-4). The defendant's intent was plain, notwithstanding the slim chances of his scheme's success or its ultimate failure. *United States* v. *Reifler*, 446 F.3d 65, 96 (2d Cir. 2006) ("[T]o violate the [wire fraud] statute, the defendant need not have completed or succeeded in his scheme to defraud, and the scheme need not have resulted in actual injury to the scheme's victims. Further, where a necessary consequence of the scheme, if it were successful, would be injury to others, fraudulent intent may be inferred from the scheme itself.") (quotations and citations omitted); *United States* v. *Manas*, 272 F.3d 159, 161 (2d Cir. 2001) ("[T]he test for

---

[2] American Reclaimed Properties was the company that the defendant elected to list as the purchaser on the contract in which he agreed to pay $22 million in cash to purchase the properties from Milbank. (Tr. 193-94, 207. 211-12, 224-27).

calculating a loss for sentencing purposes is whether defendants intended that others suffer a loss, regardless of the likelihood of success of their fraudulent scheme.").

Accordingly, the Government respectfully submits that, in light of the evidence presented at trial, the Court should find that the intended loss for the scheme charged in Count Two was $22 million, as reflected in the PSR.

## II. A Guidelines Sentence For The Defendant Would Be Sufficient, But Not Greater than Necessary, to Address the Statutory Goals of Sentencing

### A. Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).

In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 224 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater

than necessary" to comply with the purposes set forth in paragraph two.  That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a).  Section 3553(a) further directs the Court -- in determining the particular sentence to impose -- to consider:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See id.*

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  *See Crosby*, 397 F.3d at 103.  First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id.* at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  *Id.*  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  *Id.* at 113.  In so doing,

it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

  **B.**  **Discussion**

    In this case, a sentence within the applicable Guidelines range is appropriate for the defendant, primarily for the sentence imposed to reflect the serious nature and circumstances of the defendant's offenses, to provide adequate deterrence, and to protect the public from further crimes of the defendant, who is now entering his sixth decade of committing financial frauds.

    **1.**  **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

    With respect to the nature and circumstances of the instant offenses, the defendant concocted two brazen frauds that, while ultimately unsuccessful, sought to defraud others of millions of dollars of money and property. The defendant's USDA grant fraud involved the defendant's creation of a complex and entirely fictional back-story, including a purported $2.25 million grant award to the defendant's company to fund sea cucumber farms in the South Pacific. As the evidence at trial made clear, the defendant aggressively sought to "sell" this grant award to potential victims, even offering to fly one of his victims to Washington, D.C., to meet the official who supposedly awarded the money to the defendant and promising another victim that there would not be "any problem" with transferring the grant money to him. (Tr. 62-63, 88-90).

    Similarly, the defendant's real estate scheme was built on the defendant's bold and oft-repeated lies; he convinced both his accomplices and, for a time, his potential victim that he was a wealthy real estate investor with the means to purchase $22 million of real estate in

New York City in an "all cash" transaction.  To further this scheme, the defendant created fraudulent financial documents, including a bank statement showing $58 million in assets and three $5 million checks, containing entirely false representations about the defendant's ability to pay for such properties.  These egregious misrepresentations make clear that the defendant simply has no regard for the truth or any laws prohibiting him from using lies to trick others into handing over their money and property.

With respect to the history and characteristics of the defendant, the defendant has devoted most of his life to attempting to cheat and steal from others, and shows absolutely no sign of stopping such conduct.  The defendant's first fraud conviction at age 20 involved the "theft and forgery of checks" from a fraternity at Muhlenberg College.  (*See* PSR ¶¶ 34-36).  The defendant has built upon that foundation of fraud in the intervening years.  Since his first conviction, the defendant has repeatedly created and attempted to carry out schemes to defraud others, usually involving his own businesses and forged checks or other fraudulent financial documents.  (*See* PSR ¶¶ 37-39, 43-58, 62-64).   The instant case – his eleventh criminal conviction, seventh fraud or forgery conviction, and sixth federal felony conviction  – demonstrates that the defendant's prior encounters with the criminal justice system, and the substantial terms of imprisonment he has previously received, have not deterred him from continuing to concoct and attempt to carry out schemes to defraud.

Given this record, the Court should reject the defendant's claim that he is entitled to a downward departure because his "criminal history category substantially over-represents the

seriousness of the defendant's criminal history."[3] (Def. Ltr. at 5).  There is no reasonable basis in the record to support such a conclusion.  The defendant's criminal history is marked by serious and substantial fraudulent conduct over the last six decades, with repeated attempts by the defendant to cheat, trick, and steal from others millions of dollars in money and property.  While the defendant claims that he has "only" been convicted of the instant offenses and one other criminal offense in the last two decades, that fact appears primarily to be the result of the defendant's prolonged periods of imprisonment over the last twenty years. (*See* Def. Ltr. 5).  In any event, the defendant has attempted to overcome even that obstacle to his continuing attempts to defraud others.  In what is a powerful example of the defendant's intense devotion to attempting to commit frauds, the defendant has now been convicted on two separate occasions of trying to carry out multi-million dollar fraud schemes *while incarcerated* in federal correctional institutions on other charges. (*See* PSR ¶ 56.)

### 2. The Need for the Sentence Imposed to Reflect the Purposes of Sentencing

The Government respectfully submits that each of the purposes of sentencing weighs strongly in favor of a Guidelines sentence, with the most pertinent to the instant case being the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the

---

[3] In his submission, the defendant quotes only a portion of the Guidelines commentary on this issue, asserting that the "Guidelines Commentary gives as an example of a situation warranting a downward departure where a defendant has two prior convictions 'close to ten years prior to the instant offense.'" (Def. Ltr. at 5). The Guidelines commentary in question actually provides that a downward departure "may be warranted if . . . the defendant *had two minor misdemeanor convictions* close to ten years prior to the instant offense *and no other evidence of prior criminal behavior in the intervening period*." U.S.S.G. § 4A1.3, app. n. 3 (emphasis added).

defendant.

First, as discussed above, the offenses committed by the defendant were very serious: they involved gross misrepresentations by the defendant over the course of extended periods of time, and were intended to deceive others into giving the defendant millions of dollars in money and property to which he was not entitled. The defendant's conduct, involving brazen lies about his own wealth and identity, demonstrates his total lack of respect for the law and disregard for any obligation to tell the truth in the course of a financial transaction. A substantial punishment, in the form of a Guidelines sentence, is needed to deliver the message to the defendant, and others, that such egregious lies and prolonged fraudulent schemes will be met with severe sanctions.

Second, a substantial term of imprisonment is required in this case to have any hope of deterring the defendant from committing additional crimes in the future. As discussed above, the defendant's criminal history is long and incredibly consistent: the defendant perpetrates financial frauds over and over again, frequently employing forged and otherwise fraudulent financial documents to carry out his schemes. The defendant's prior criminal conduct has been met with substantial periods of incarceration, including what appears to be a continuous period of imprisonment for various offenses extending from approximately December 1991 through January 2008, but has not been deterred from committing additional crimes. (*See* PSR ¶¶ 52-61). In fact, while on supervised release in 2008 and the first three-quarters of 2009, the defendant committed the USDA grant scheme underlying Count One of the Indictment. (PSR ¶ 8-11). In November 2009, the defendant's supervised release was revoked and he was sentenced to an additional 15-month term of imprisonment. (PSR ¶ 61). During that period of incarceration,

the defendant recruited accomplices, including one fellow inmate, to assist him in carrying out the real estate fraud scheme underlying Count Two of the Indictment, and began to work toward tricking Milbank into turning over millions of dollars in real estate without getting paid. (PSR ¶ 11).

The defendant's criminal history and his commission of the instant offense conclusively demonstrate that, at this time, the defendant is simply unable to live a law-abiding life.  In the past, neither the threat of a long prison term nor actual incarceration has served to stop the defendant from committing additional crimes.  There is no reason to believe that, if offered leniency in this case, the defendant would abstain from committing even more frauds.  To the contrary, the only response to this defendant's conduct, and his repeated refusal to heed the messages that prior sentencing courts attempted to impress upon him, is to impose another substantial term of incarceration, as recommended by the Probation Office.

Finally, apart from any deterrent effect resulting from a Guidelines sentence, a substantial term of incarceration is needed in this case to protect the public from further crimes of the defendant.  While, as the defendant's prior conduct makes clear, his incarceration will not assure that he abstains from committing crimes, it provides the best chance for the public to be protected from the defendant's schemes. Incarceration will, at a minimum, hinder the defendant's efforts to take advantage of others for the purposes of his own financial gain.

The defendant claims that this sentencing factor weighs in favor of a less serious sentence given the defendant's age, observing that there are statistics showing a generally "inverse correlation between recidivism and age." (Def. Ltr. at 5-6). However, the statistics cited by the defendant do not support a lighter sentence for the defendant in this case; the inverse

relationship cited by the defendant is *substantially* reduced for those offenders with the highest criminal history scores. Specifically, offenders in criminal history category V over the age of 50 were actually *more likely* to recidivate than offenders in category V between the ages of 26-30, 31-35 and 36-40. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, Exhibit 9 (2004).

In any event, whatever the statistical relationship between recidivism and age, it is clear that this defendant presents a serious risk of future criminal conduct. The defendant has repeatedly engaged in criminal conduct both inside and outside of prison, and has been undeterred from doing so even after lengthy prison terms. *See, e.g.*, *United States* v. *Jones*, 2009 WL 3248154, at *1 (D. Conn. Oct. 5, 2009) ("While defendant is of an age that groups him with others who, overall, are statistically less prone to recidivism, it does not suggest impropriety in looking at a defendant's record of criminal conduct. It also does not suggest that the court must ignore the conduct of which defendant stands convicted.").

Accordingly, given the defendant's lengthy criminal record of committing financial frauds similar to the instant offenses, this Court should impose a Guidelines range sentence so that the sentence imposed reflects the seriousness of the brazen attempted frauds at issue here, and to deter and to incapacitate the defendant from committing further crimes.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully submits that a sentence within the advisory Guidelines range is appropriate in this case.

Dated: New York, New York
October 17, 2011

Respectfully submitted,

PREET BHARARA
United States Attorney

By:  /s/ Adam Fee
Adam Fee
Assistant United States Attorney
Tel.: (212) 637-1589

**CERTIFICATE OF SERVICE**

I, Adam Fee, declare that I am employed in the Office of the United States Attorney for the Southern District of New York, and on this 17th day of October, 2011, I caused the Government's Sentencing Memorandum to be served by CM/ECF on all counsel of record.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.

Dated: New York, New York
       October 17, 2011

                                     /s/ Adam Fee
                                     Adam Fee
                                     Assistant United States Attorney